IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICKY LOUA THOR,

    Petitioner,                   No. 2:07-cv-00683 ALA HC

    vs.

D.K. SISTO, Warden

    Respondent.                <u>ORDER</u>

      Pending before the Court are Ricky Loua Thor's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (Doc. 1), Respondent's Answer (Doc. 6), and Petitioner's Reply, which he labeled "Traverse" (Doc. 7). For the reasons discussed below, Petitioner's application is denied.

**I**

**A**

      On June 10, 1994, the Merced County Superior Court found Petitioner guilty of the following crimes: (1) second degree murder, in violation of California Penal Code § 187, with enhancements for the use of a firearm pursuant to California Penal Code § 12022(a)(1); (2) robbery, in violation of California Penal Code § 211; and (3) conspiracy to commit robbery, in violation of California Penal Code § 182. He was sentenced to 21 years to life. Petitioner

appealed and the California Court of Appeal affirmed.

**B**

The Statement of Facts from the opinion prepared by the California Court of Appeal described Petitioner's crimes as follows:

> On Sunday, April 4, 1993, a group of young Hmong men gathered outside the home of a then 13-year old female, Chong H. This group included appellants Thor and Moua, Bee Vang (known as Bee), Fue Lee (known as Dolby or D-Boy), Sue Lee (known as Tony), Phong Vang (known as Skinny Boy), and Yang Pao Vue (known as Pao). Chong's home was regularly used as a meeting place for this group, which formed the core of the Merced area Hmong street gang known as the Oriental Locs (hereafter O.L.).
>
> During this meeting, Thor, Moua, Bee, Dolby, Tony and Skinny Boy prepared a plan to rob the Punkin Center, a store in Atwater, in order to obtain firearms. They intended to steal a vehicle to transport them to and from the Punkin Center and then dispose of the vehicle afterwards. After arriving at the store, the plan called for one person to go inside the store and distract the owner. The remaining members would come inside shortly thereafter, jump the store owner, and bind him with tape. Bee was to obtain the stolen vehicle, while the others were to bring tape to bind the store owner, and rice bags with which to carry away the stolen weapons. They would then abandon the stolen vehicle a few miles from the store.
>
> On April 4 or 5, 1993, a license plate from a 1981 Toyota was switched with a plate from a 1982 Toyota. On April 5, 1993, the 1982 Toyota was reported stolen. On Monday, April 5, 1993, using the stolen 1982 Toyota, Thor, Moua, Bee, Skinny Boy, and Dolby drove to the Punkin Center intending to rob the store of its weapons according to the plan. Moua and Skinny Boy went inside, but decided they could not carry out the plan at this time because there were too many customers present in the store.
>
> The following morning, Tuesday, April 6, 1993, Thor, Moua, Bee, Dolby, and Skinny Boy returned to the Punkin Center. Bee went inside, carrying an empty rice bag and a .357 revolver. The others waited outside and watched for police. A shot was fired and shortly thereafter Bee ran out of the store with the rice bag, which was now filled with weapons. All the participants drove away in the stolen Toyota.
>
> At approximately 9:55 a.m. on April 6, the body of Don Hughes, the owner of the Punkin Center store, was discovered behind the front counter. Mr. Hughes had been shot once through the head. He had last been seen alive around 9:00 a.m. on April 6.

>An expended .357 or .38 caliber bullet was recovered from behind the front counter. Seventeen weapons were determined to be missing from the display case inside the store. The stolen 1982 Toyota, bearing the plates stolen from the 1981 Toyota, was found abandoned in an almond orchard approximately six miles from the Punkin Center.
>
>On April 12, 1993, during a gang-related street shoot-out, Bee was killed. At the time of his death, Bee was holding a revolver, which Pao took from him and disposed of in a nearby school yard. The weapon was subsequently found and identified as one of the guns stolen from the Punkin Center during the April 6 robbery.
>
>The resulting investigation led to the arrests of Thor and Moua. During questioning by the police, Moua waived his right to remain silent. Moua said that he and Thor were involved in the planning of the robbery and had waited outside in the stolen Toyota on April 6, 1993, while Bee went inside to rob the Punkin Center, and that he (Moua) had received a gun as payment for his involvement in the crimes. Moua had earlier acknowledged to a police officer that he was a member of the O.L. gang. At trial, however, Moua testified that he had abandoned the idea of robbing the store after leaving the Punkin Center on Monday, April 5. Moua also maintained at trial that on April 6 he had simply hitched a ride in a car with Bee, and just happened to end up at the Punkin Center at the time of the robbery and murder.
>
>Thor's defense was that while he frequently visited Chong's house, and may have been there on April 4, he did not participate in the planning of the robbery. He also maintained that he had been at school on April 6 at the time the robbery and murder occurred, and that he was not a member of the O.L. gang.
>
>Pao, who was a member of the O.L. gang but not a participant in the planning or execution of the robbery, made a statement to the police and was a key witness for the prosecution at trial. Pao identified both Thor and Moua as active participants in the planning and execution of the robbery which resulted in Mr.Hughes' death; identified five weapons stolen from the Punkin Center as being in the possession of Thor; and provided specifics of the plan that was formed on April 4, 1993. Skinny Boy also gave a statement to the police and testified for the prosecution. Moua's initial confession was also admitted into evidence.

### C

On March 1, 2006, the California Board of Parole Hearings ("BPH") determined that Petitioner was not suitable for parole, and that he "would pose an unreasonable risk of danger to society and a danger– threat to public safety if released from prison." BPH March, 2006

Decision at 43. The BPH's decision noted that the commitment offense was carried out in an especially callous manner. Specifically, it stated that the offense was "carried out in a calculated manner and one is [sic] an execution manner. It was carried out in a manner which demonstrated an exceptionally callous disregard for human suffering." *Id.* at 44. The BPH discussed the fact that all of the appellate court decisions involving Petitioner and his co-defendants noted that Petitioner played a key part in the planning and execution of the commitment offense. The BPH also cited Petitioner's escalating pattern of criminal conduct, citing his juvenile history of theft and burglary, and his failure to modify his behavior despite numerous interactions with the probation system. Furthermore, the BPH pointed to Petitioner's gang involvement, which it found demonstrated an unstable and tumultuous relationship with the community. Lastly, the BPH stated it was impossible to assess and incorporate the submitted psychological evaluation prepared for the parole hearing into its determination of suitability for parole. *Id.* at 47. The BPH noted that Petitioner denied committing the crime and that it was impossible to assess how that denial fit within the factors for determination of suitability. *Id.* at 47-8.

Petitioner challenged the BPH decision by filing a state petition for a writ of habeas corpus in the Merced County Superior Court. That court denied his petition on September 6, 2006, finding that "there is some evidence to support the Board's decision in denying parole on March 1, 2006. The Parole Board correctly noticed the sophistication of the planning and execution of the crime." It also concluded that:

> Petitioner in his reply brief correctly sets forth the standards of review and statutory requirements, regarding the Board decision and applicable law in a Parole Hearing. However, the court finds that there is some evidence to support the Board's decision on denying parole on March 1, 2006. The Parole Board correctly noted the sophistication of the planning and execution of the crime. Petitioner was a member of the Oriental Locs, a street gang, the planning of stealing a car, switching license plates and the stealing of firearms.

Petitioner next filed a petition for a writ of habeas corpus before the California Court of

4

Appeal for the Fifth Appellate District. That court summarily denied the petition on January 4, 2007. Petitioner then filed a petition for review before the California Supreme Court. That court summarily denied the petition for review on March 21, 2007. Petitioner filed an application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254(a) on April 10, 2007. In assuming Petitioner's entitlement to habeas relief, this Court reviews the Superior Court's order. *See Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) (explaining that when a subsequent appeal is denied without comment, a federal court must look to the last state court decision to actually address a claim).

## II

An application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

>   (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### A

Petitioner does not challenge his underlying conviction. Rather, he asserts that his due process rights were violated when the BPH denied him parole. Challenges to parole denials are construed as procedural due process claims. "'A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.'" *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th

1  Cir. 1998)). The Ninth Circuit has held that "California's parole scheme gives rise to a
2  cognizable liberty interest in release on parole." *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d,
3  1123, 1127-28 (9th Cir. 2006). This Court is bound by that decision. *See Zuniga v. United Can
4  Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted) ("District courts are, of course, bound
5  by the law of their own circuit, and 'are not to resolve splits between circuits no matter how
6  egregiously in error they may feel their own circuit to be.'").

7  In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that
8  "revocation of good time does not comport with 'the minimum requirements of procedural due
9  process,' unless the findings of the prison disciplinary board are supported by 'some evidence' in
10 the record." (Citation omitted). The Ninth Circuit has held that *Hill*'s some evidence standard
11 applies to parole release proceedings. *See Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007)
12 ("the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner
13 of due process with respect to this interest if the board's decision is not supported by 'some
14 evidence in the record,' . . . or is 'otherwise arbitrary'"). Respondent contends that because the
15 Supreme Court has never applied the some evidence test to a parole decision, this Court is not
16 required to apply it. This Court must apply the Ninth Circuit's holding that the some evidence
17 standard applies in parole release decisions. *Zuniga*, 812 F.2d at 450.

18 In *Irons*, the Ninth Circuit held that

> where, as here, there is some evidence to support a finding that
> "the offense was carried out in a manner which demonstrates an
> exceptionally callous disregard for human suffering" and the
> "motive for the crime is inexplicable or very trivial in relation to
> the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we
> cannot say that the state court unreasonably applied *Hill*'s "some
> evidence" principle.

23 *Irons*, 505 F.3d at 853. In *Irons*, the record showed that the BPT relied on the commitment
24 offense in determining that the prisoner was unsuitable for release on parole. *Id.* at 852.

25 The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d
26 at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today,

therefore, is that, given the particular circumstances of the offenses of these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." 505 F.3d at 853-54. In an unusual comment in *Irons*, the panel expressed its hope that some future court decision will conclude that the BPT has the duty to grant parole where "there was substantial evidence in the record demonstrating rehabilitation." *Id.* at 854.

The Court stated:

> We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Id.*

The *Irons* panel did not cite any authority to support its prognostication that a state court's denial of habeas corpus relief, under such circumstances, would be "contrary to, or involve[] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in violation of 28 U.S.C. § 2254(d)(1). No presently binding Ninth Circuit decision has fulfilled the prediction of the *Irons*'s panel.

In the precedential portion of the *Irons* decision, the court held that "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851. A prisoner's commitment offense, on its own, may justify parole denial if "the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061, 1071 (2005)). An offense committed in an especially heinous, atrocious or cruel manner is a factor tending to

7

show unsuitability for release. Cal. Code. Regs., tit. 15 § 2402(c)(1).

Thus, this Court turns to the question whether some evidence supported the BPH's March 1, 2006, decision to deny Petitioner parole.

**B**

Petitioner alleges that the BPH's decision to delay his parole release date violated his federal due process rights because "the Board's decision was arbitrary and capricious because it was not based on any relevant, reliable evidence." Pet'r Mem. Supp. Pet. 1. This contention lacks merit. Pursuant to Ninth Circuit law, the BPH's decision comports with due process, and is therefore not arbitrary, so long as it is supported by some evidence. Here, the BPT relied upon the nature of Petitioner's commitment offense, his escalating criminal record, gang connections, and his institutional misconduct. As explained below, some evidence supported its decision.

**C**

Petitioner also contends his federal due process rights were violated, because Petitioner's commitment offense was not proper evidence to support the decision to deny parole. Petitioner emphasizes that the murder in this case was not one he personally committed and that it was instigated independently and "spontaneously" by co-defendant Bee Vang. Petitioner argues that his imprisonment term cannot be prolonged based upon the murder because it "was not contemplated or expressly agreed to as part of the conspiracy."

Determining whether the some evidence standard is satisfied only requires the Court to determine whether there is *any* reliable evidence in the record that *could* support the decision made. *Hill*, 472 U.S. at 472. As discussed above, pursuant to *Irons*, "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851. A prisoner's commitment offense, on its own, justifies parole denial if "the Board can 'point to

8

factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)). Thus, pursuant to *Irons,* the Governor may rely on static factors to find that an inmate is unsuitable for parole.

Section 3041(b) provides that the BPT

> "shall set a release date unless it determines the gravity of the offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

Section 2402 of the California Code of Regulations sets forth the circumstances that tend to demonstrate unsuitability for parole release. Section 2402(c)(1) provides that the nature of a commitment offense may justify denial if the "prisoner committed the offense in an especially heinous, atrocious or cruel manner."

The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

Petitioner has cited no authority for the proposition that a commitment offense committed by a member of a conspiracy is any less heinous when the parole candidate was not the conspirator who committed the murder.

In the instant case, the BPH's findings are sufficient to show that Petitioner is unsuitable for parole pursuant to Cal. Pen. Code Section 3041(b) and Cal. Code Regs. tit. 15, Section 2402. The BPH noted that offense was carried out in an "especially callous" and "calculated" manner. BPH March, 2006 Decision at 44. While acknowledging that Petitioner was not actually in the

9

1  store at the time of the shooting, the BPH emphasized the "integral part" that the Petitioner
2  played in the meticulous manner in which the robbery was planned and executed "in
3  furtherance" of the gang's activities. *Id.* at 44-5.  Specifically, the BPH cited facts such as
4  Petitioner's direct participation in methodical theft of vehicles and the exchange of license plates
5  related to the offense.  Also, he cased the target store and postponed the offense so as to isolate
6  the store's proprietor. *Id.* at 44.  In particular, the fact that the shooting was execution-style
7  demonstrated an "exceptionally callous disregard for human suffering." *Id.*

8        The BPH's analysis emphasized aspects of the commitment offense executed by
9  Petitioner that were particularly egregious.  Those aspects of the offense support the conclusion
10  that it was carried out in an especially heinous, atrocious or cruel manner.  Therefore, the BPH's
11  determination that Petitioner is unsuitable for parole is supported by some evidence.

**D**

13        Petitioner next contends he is entitled to be released on parole because he was in high
14  school at the time of his commitment offense.  At the time of his challenged BPH hearing,
15  Petitioner was thirty years old.  He argues that his commitment offense is not a predictor of his
16  present risk of danger to society.

17        Petitioner cites *Rosenkrantz v. Marshall*, 444 F. Supp. 2d 1063, 1084 (C.D. Cal. 2006) in
18  support of his argument. The District Court in *Rosenkrantz* held that continued reliance on
19  unchanging circumstances "after nearly two decades of incarceration and half a dozen parole
20  suitability hearings . . . violates due process because petitioner's commitment offense has
21  become such an unreliable predictor of his present and future dangerousness that it does not
22  satisfy the 'some evidence' standard."  In support of this statement, the *Rosenkrantz* decision
23  cites *Biggs v. Terhune*, 334 F.3d 910, 917 (9th Cir. Cal. 2003).  However, as explained above, all
24  that *Biggs* stated was that "[a] continued reliance in the future on an unchanging factor, the
25  circumstance of the offense and conduct prior to imprisonment, runs contrary to the

26

rehabilitative goals espoused by the prison system and could result in a due process violation." *Id*. That statement was dicta. It did not bind the *Rosenkrantz* court, and it does not bind this Court. Under binding Ninth Circuit precedent, a commitment offense is some evidence that an inmate is unsuitable for parole, no matter how much time has passed since the offense occurred.

### E

Petitioner also argues that he is entitled to be released on parole because he does not have an unstable social history. Section 2402 of the California Code of Regulations sets forth a "history of unstable or tumultuous relationships with others" as a circumstance that tends to demonstrate unsuitability for parole release. The California Court of Appeal has held that facts implicating "early involvement in criminality" and multiple contacts with law enforcement and incarceration as a juvenile constitute the "modicum of evidence" necessary for establishing an unstable social history. *In re Bettencourt,* 156 Cal. App. 4th 780, 804 (2007).

Here, Petitioner argues that the BPH's finding that he had an unstable social history was not supported by some evidence because he was not charged with a gang enhancement. The BPH's unstable social history finding relies on evidence in the record of Petitioner's escalating juvenile record and history of gang involvement. These facts are sufficient to constitute an unstable social history. Coupled with the nature of the commitment offense, they constitute some evidence to deny the setting of a parole release date.

### F

Petitioner contends that he is entitled to be released on parole because habeas corpus application must be granted if any one factor is unsupported by evidence. This argument fails. First, all of the factors cited by the BPH such as heinous aspects of commitment offense and institutional behavior citations are some evidence that Petitioner is unsuitable for parole.

Second, Petitioner sets forth no authority to support the proposition that habeas relief is mandatory if any factor cited by the BPH is unsupported by evidence. Section 2402 leaves the precise weighing of factors to the BPH. Cal. Code Regs. tit. 15 §2402(c), (d). It does not require

that the board find any particular number of factors indicating unsuitability to deny parole, nor does it mandate what weight the board give those factors. *Id*. Section 2402(b) permits the BPH to look at all relevant information, and permits their decision to be based on more than the enumerated factors in the sections that follow. Neither the list of factors in section 2402(c) or in 2402(d) is exhaustive.

Furthermore, California law does not prescribe any specific procedure for the BPH to follow.  Therefore, this Court may not review how the BPH weighed the factors it cited, nor whether it used certain factors to make its decision. *See Irons,* 505 F.3d at 851 (holding that a federal court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*.").

### G

Petitioner claims that he is entitled to be released on parole because he has no previous record of violence.  Section 2402(b)(2) of the California Code of Regulations sets forth that a previous record of violence tends to demonstrate unsuitability for parole release if "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age."  In the instant case, Petitioner contends that his juvenile history of burglary and resisting arrest was non-violent in nature.  California law does not mandate release on parole if an inmate has no prior record of violent behavior.

Petitioner contends that he is entitled to be released on parole because he has no history of severe mental problems.  Section 2402 of the California Code of Regulations sets forth that "a lengthy history of severe mental problems related to the offense" is a factor that tends to demonstrate unsuitability for parole release.  Petitioner cites no authority to support his argument

that parole is mandatory if an inmate does not present a history of severe mental problems.  In the instant case, the BPH's decision was supported by some evidence, and therefore satisfies due process requirements.

Petitioner argues that he is entitled to be released on parole because his institutional behavior was non-violent.  He assumes that the absence of violent institutional behavior tending to demonstrate unsuitability for parole, by extension, implies suitability.  The language of statutory guidelines for determining parole suitability specifies that violent institutional behavior should be considered as demonstrating unsuitability and does not state the inverse argument.  Section 2402 of the California Code of Regulations sets forth that "engag[ing] in serious misconduct in prison or jail" is a circumstance that tends to demonstrate unsuitability for parole release.  In *Bettencourt*, 156 Cal. App. 4th at 805, the California Court of Appeal rejected the defendant's argument that a "non-violent and largely remote" disciplinary record fails to provide reliable evidence that his release would pose an unreasonable risk to society.

Petitioner's institutional violations, which consisted of four CDC-128A's and 2 CDC-115's, constituted some evidence that Petitioner engaged in serious prison misconduct.  A CDC-128A documents incidents considered to be minor in nature; a CDC-115 documents misconduct which is a violation of law or which is not minor in nature.  Cal. Code Regs., tit. 15 § 3312(a)(2), (a)(3). These citations are relevant for purposes of evaluating parole suitability, regardless of whether they are violent.  *See Bettencourt*, 156 Cal. App. 4th at 805.

## H

Finally, Petitioner claims that the BPH violated his due process rights because he was denied parole based upon his refusal to admit guilt.  "[A] prisoner's refusal to admit participation in the crime on matters of conflicting evidence does not necessarily constitute unsuitability for parole or mandate rescission." *In re Caswell*, 92 Cal. App. 4th 1017, 1033 (2001) (citation omitted).  The record shows, however, that the BPH denied a grant of parole to Petitioner based on some evidence of other factors that do demonstrate unsuitability.

**Conclusion**

The BPH's finding that Petitioner is unsuitable for release on parole was supported by some evidence. Therefore, the state court's denial of his petition for habeas corpus on this ground was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

/////
/////
/////

It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief is DENIED. The clerk is directed to enter judgment and close the case.

/////

DATED: July 24, 2008

/s/ Arthur L. Alarcón
_____
UNITED STATES CIRCUIT JUDGE
Sitting by Designation